IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| STEVEN ONTKO, ) | Case No. 3:21-cv-00951 |
| ) | |
| Plaintiff, ) | |
| ) | MAGISTRATE JUDGE |
| v. ) | THOMAS M. PARKER |
| ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | **MEMORANDUM OPINION AND** |
| ) | **ORDER**[1] |
| Defendant. ) | |

    Plaintiff, Steven Ontko, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. Ontko challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ misevaluated his residual functional capacity ("RFC") as to his use of his left arm and hand. Because the ALJ properly applied the legal standards and reached a decision supported by substantial evidence and any arguable error was harmless, the Commissioner's final decision denying Ontko's applications for DIB and SSI must be affirmed.

**I.    Procedural History**

    Ontko applied for SSI and DIB on April 1, 2019. (Tr. 271-279).[2] He said that he became disabled on March 16, 2019 due to: (1) cerebrovascular accident; (2) alcoholism; (3) stenosis of

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. ECF Doc. 12.
[2] The administrative transcript appears in ECF Doc. 13.

left and right carotid artery; (4) stenosis of internal carotid artery; (5) acute cerebrovascular accident; (6) iron deficiency anemia; (7) normocytic anemia; and (8) left hemiparesis.  (Tr. 297, 312).  The SSA denied Ontko's claim initially and upon reconsideration.  (Tr. 109-126, 147-164).

ALJ Mary Morrow heard Ontko's case on July 16, 2020 and denied the claim in a July 30, 2020 decision.  (Tr. 59-73, 79-107).  In doing so, the ALJ determined at Step Four of the sequential evaluation process that Ontko had the RFC to perform light work, except that:

> [Ontko can] occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and, occasionally stoop, kneel, crouch, and crawl.  He can frequently reach overhead, handle, finger, and feel with the left upper extremity; but is limited to lifting no more than five pounds with the left upper extremity.  He can never be exposed to hazards such as moving machinery and unprotected heights; and may not engaged in commercial driving.  He can perform simple, routine, and repetitive tasks, but not at a production rate pace (so, for example, no assembly line work.)  He can respond appropriately to occasional interaction with supervisors and co-workers, but should have no team or tandem work with co-workers and no interaction with the general public.  He can tolerate few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work environment; any necessary changes need to occur infrequently and be adequately and easily explained.

(Tr. 63-64).  Based on vocational expert testimony that a hypothetical individual with Ontko's age, experience, and RFC could work in such available positions as mail clerk, officer helper, and housekeeping cleaner, the ALJ determined Ontko wasn't disabled.  (Tr. 72-73).  On April 5, 2021, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4).  And on May 7, 2021, Ontko filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ontko was born on October 14, 1972 and was 46 years old on the alleged onset date. (Tr. 312).  He completed high school in 1991 and had some specialized training in high school

for masonry. (Tr. 298). He had prior work as a laborer at a water park and in "construction/sanitation." (Tr. 299).

### B. Relevant Medical Evidence

Ontko limited his challenge to the ALJ's Step Four assessment of his RFC, specifically the limitations related to his left arm and hand; thus, it is only necessary to summarize the evidence related to his left upper extremity. *See generally* ECF Doc. 15.

On March 16, 2019, Ontko was admitted to the emergency department at Mercy St. Vincent Medical Center, complaining of the sudden onset of left-side weakness. (Tr. 666). He came to the hospital through the mobile stroke unit and was reported to have right-side deviation and completely flaccid left-side extremities with sensory loss. (Tr. 666, 668). A physician performed a stroke evaluation and found that Ontko had reduced functionality in his vision, facial palsy, no movement in his left arm or leg, limb ataxia, totally sensory loss in part of his body, and mild or moderate aphasia with dysarthria. (Tr. 668-669). After undergoing several imaging and testing procedures, the final impression was that Ontko had suffered a cerebrovascular accident. (Tr. 669-673). By his discharge to the impatient rehabilitation unit, on March 22, 2019, Ontko was diagnosed with a multifocal ischemic stroke. (Tr. 809-810, 813).

On March 22, 2019, Ontko received occupational and physical therapy. (Tr. 814-819). The therapist noted that Ontko was unable to functionally use his left upper extremity; but he was able to demonstrate his left shoulder's flexion and extension. (Tr. 815). With assistance, Ontko could demonstrate flexion and extension in his elbow, wrist movement, and grasping and releasing with his hand. *Id.* But he was noted to be "unable to use L UE functionally on this date." *Id.*

3

On April 8, 2019, Ontko had a 30-day follow-up for his stroke and nothing unusual was noted. (Tr. 400).

On April 11, 2019, Ontko had a physical therapy session. (Tr. 397). He reported that he required extra time for his daily living activities because of his left-hand weakness. *Id.* On reviewing his range of motion and a physical examination, the therapist noted that Ontko had intermittent numbness on his left side, including his face, hand, and leg, and had dysmetria on his left side. (Tr. 398). He was instructed to begin a physical therapy program. (Tr. 399).

On April 16, 2019, Ontko had another physical therapy session, which was unremarkable regarding his left upper extremities, and a follow-up appointment with Magruder Hospital for his stroke. (Tr. 395, 1071). At his follow-up appointment, it was noted that his left-hand weakness persisted and, after examination, noted it in his left-hand grip strength. (Tr. 1071).

On April 18, 22, and 25, 2019, Ontko continued his physical therapy. (Tr. 390-394). Ontko continued working on his left hand and, during his last session, he reported being fatigued from digging a trench in his yard for five hours for two days. *Id.*

On April 25, 2019, Ontko had a neurological exam with Shireen Khan, MD. (Tr. 385). Ontko reported that, although his left-side weakness had improved generally, he still experienced it with his hand. *Id.* On physical examination, Dr. Khan observed that Ontko's muscle strength was normal, except for his left hand which had 4 out of 5 strength; his left upper extremity had mild spasticity; and his fine motor movements were impaired on his left. (Tr. 387). Also, Dr. Khan found that Ontko had decreased sensation to light touch and pin pricks on his left extremities, and Ontko's cerebellar had impaired his fine motor movements on his left side, but he did not have any involuntary movements or tremors. *Id.*

4

On April 29 and May 2, 2019, Ontko had physical therapy.  (Tr. 383, 1112).  During the April 29 session, Ontko reported fatigue from continuing to dig a trench in his yard.  (Tr. 383).  Otherwise, no change in his left upper extremity was noted.  (*See* Tr. 383-384, 1112-1114).

On May 3, 2019, Ontko had a follow-up appointment regarding his stroke.  (Tr. 1106).  He reported mild, left-side weakness, mainly in his hand.  *Id.*  On evaluation, he was found to be slightly disabled, being unable to carry out all his previous activities but being able to look after his own affairs without assistance.  (Tr. 1107).

On May 3, 2019, Ontko also had an occupational therapy session.  (Tr. 1108-1109).  He reported having a little difficulty using his left hand for fine motor actions, and a physical examination demonstrated that the strength in his shoulder, elbow, and wrist was, generally, normal to minimally impaired.  (Tr. 1110).  The therapist assessed him with decreased range of motion, strength, and coordination, and recommended occupational therapy for his hand.  (Tr. 1111).  The therapist diagnosed him with impaired hand strength, coordination, and range of motion in his left hand, wrist, and forearm.  *Id.*

On May 7, 2019, Ontko had a follow-up appointment at Magruder Hospital for his stroke, which confirmed his continued left-side weakness, including his grip strength.  (Tr. 1073-1074).

From May 8 to May 22, 2019, Ontko continued his physical therapy.  (Tr. 1098-1106).  Ontko was consistently assessed with decreased range of motion, strength, and coordination, and his therapy generally focused on his left hand.  *Id*.  Initially, it was noted that he showed improvement with his left-hand extension and strength, but later he was noted as having difficulty completing finger opposition exercises, requiring rest breaks to complete the exercises, having decreased tightness and stiffness in his hand, or experiencing muscles spasms or numbness in his left hand.  *Id.*

5

On May 28, 2019, Ontko had an appointment at Magruder Hospital and was noted as having improved range of motion and strength in his left hand, no neurological issues, and improved left-hand grip strength, although some weakness persisted. (Tr. 1076-1077).

From May 30 to June 17, 2019, Ontko continued his physical therapy about twice a week. (Tr. 1085-1097). His assessment and diagnoses remained unchanged. *Id.* Ontko reported using his left hand when not in therapy, such as his difficulty in using a q-tip, tightness in his left thumb and index finger, painting his dining room, or that he had put "together roto tiller yesterday and it took many hours w rest breaks." *Id.* During the exercises, it was also occasionally noted that he would need to rest his hand when it was fatigued or would experience spasms after repetitive strengthening exercises. (Tr. 1086, 1091, 1095, 1097). During his last session, on examination, the therapist also noted that Ontko had 4 to 5 out of 5 strength in his left forearm and wrist and 4 out of 5 as to his hand generally. (Tr. 1086).

On June 18, 2019, Ontko had a follow-up appointment with the stroke center at the hospital. (Tr. 1082-1083). In a review of his symptoms, Ontko was negative for weakness and tingling. *Id.* On physical examination, it was noted that he had a left-hand tremor. (Tr. 1084).

On August 19, 2019, Ontko saw Dr. Blunt, who noted that Ontko was making progress through occupational therapy with his grip strength, but his treatment plan needed to be extended. (Tr. 1140). On physical examination, he also noted that Ontko's grip strength was improving, but he was struggling with one of the muscles in his hand and had left shoulder weakness and left bicep atrophy. *Id.*

On September 5, 2019, Ontko had an occupational therapy session. (Tr. 1176). His assessment was largely the same, with the therapist noting that he took increased time to write his name and numbers, and his left hand shook when writing. (Tr. 1177). The therapist noted

6

that Ontko was able to make a composite fist with his hand, extend all his fingers, lift his index finger when his hand was flat on a table, and adduct and abduct his fingers, except for his ring finger.  *Id.*  His left hand also had tightness and became shaky after repetitive gripping exercises.  *Id.*  His diagnoses were unchanged.  *Id.*

On September 24, 2019, Ontko had another follow-up with the stroke center, which found that he had continued tremors and dis-coordination in his left hand.  (Tr. 1171-1173).

On September 30, 2019, Ontko returned to the stroke center after having a test to confirm stenosis, which it did.  (Tr. 1258-1260).

On October 2 and 11, 2019, Ontko had additional occupational therapy sessions.  (Tr. 1168-1171).  He reported being fatigued and having difficulty with his left-hand grasp.  *Id.*  In both sessions the therapist noted that he had numbness and tingling in his left thumb and index finger, fine motor impairments in his left upper extremity, and decreased speed.  *Id.*  The therapist also noted that he was able to use his left hand to complete reciprocal and sequential movements with a mild tremor and would benefit from continued therapy.  *Id.*  His diagnoses remained unchanged from his earlier sessions.  *Id.*

On October 15, 2019, Ontko had a follow-up appointment with the stroke center.  (Tr. 1252).  On physical examination, it was noted that he still had a tremor and dis-coordination in his left hand, but there was no further discussion of his hand.  (Tr. 1253-1254).

On October 24, 2019, Ontko underwent a stent procedure for his right femoral artery and was discharged the following day.  (Tr. 1147-1159).  On the same day he was seen for, and diagnosed with, left carotid stenosis.  (Tr. 1218-1221).  During this examination, it was noted that his grip strength had decreased in his left hand to 3 out of 5.  (Tr. 1221).

From October 31 to November 6, 2019, Ontko had three additional occupational therapy sessions with the same assessments and diagnoses as he prior sessions. (Tr. 1214-1218).

On November 11, 2019, Ontko underwent additional therapy, and the therapist had the same assessments and diagnoses as before, but Ontko reported having difficulty performing finger extensions and abductions. (Tr. 1210).

On November 12, 2019, Ontko had a follow-up appointment with Dr. Blunt about his stroke. (Tr. 1335). In reviewing Ontko's symptoms, Dr. Blunt noted that his left grip strength was slowly improving and, on examination, had 3 out of 5 grip strength and wrist flexion and improved range of motion. *Id.* In his assessment, Dr. Blunt noted that Ontko's strength was slowly returning but he experienced fatigue after about 1 to 2 hours of activity. (Tr. 1336).

From November 13 to December 11, 2019, Ontko had seven occupational therapy sessions. (Tr. 1202-1209, 1308-1309). He assessment and diagnoses remained the same. *Id.* During all but the last sessions, the therapist noted that Ontko took longer or had difficulty completing the exercises and, twice, was fatigued after completing them. (Tr. 1202-1209).

On December 11, 2019, Ontko had additional occupational therapy, with the same assessment and diagnoses by the therapist. (Tr. 1308-1309).

On January 28 and February 12, 2020, Ontko saw Dr. Blunt, who, on physical examination, noted that Ontko had left-hand contractures and had minimal improvement, even with daily exercises, and later noted that Ontko's grip strength had improved. (Tr. 1354, 1351).

From February 19 to February 28, 2020, Ontko had four physical therapy sessions. (Tr. 1341-1343, 1396-1397). During his initial session, his left upper extremity strength was measured, and, save for his finger flexion and extension which was 3 out of 5, his remaining strength was 4 out of 5. (Tr. 1342-1343). He was also assessed with coordination and/or

8

proprioception deficits and strength deficits.  (Tr. 1345).  His later sessions did not indicate any changes in his condition.  (Tr. 1341, 1396-1397).

On March 2, 2022, Ontko underwent procedures to clear the stenosis on his right side and had excellent results.  (Tr. 1445-1451).

From March 5 to June 4, 2020, Ontko had 23 therapy sessions.  (Tr. 1360-1395).  Generally, his assessment and diagnoses remained unchanged.  (*See* Tr. 1379-1395).  Starting with his April 21, 2020 session, however, the therapist began consistently noting that Ontko was fatigued after his exercises or became frustrated, reducing the session's time or exercises' difficulty in response.  (Tr. 1360-1366, 1370-1373, 1375-1377).  On one occasion, about one-third of the way through the exercises, Ontko also noted that his left upper extremity "turn[ed] to fire."  (Tr. 1372).

On April 3, 2020, in the midst of the therapy sessions, Ontko had a follow-up appointment with Dr. Khan regarding his last stent procedure.  (Tr. 1437).  Ontko reported that he still had left-hand weakness and spasticity, and he had not experienced significant improvement with therapy.  *Id.*

On June 9, 2020, Ontko had a follow-up appointment with Dr. Blunt.  (Tr. 1348).  On physical examination, Dr. Blunt observed that Ontko's left hand grip strength was 3 out of 5, but his range of motion had improved.  (Tr. 1349).

On September 1, 2020, Ontko again saw Dr. Blunt, who noted that Ontko's left-side weakness was not improving, specifically in his left upper extremity.  (Tr. 44).  On physical examination, Dr. Blunt observed that Ontko's left grip was 2 out of 5.  (Tr. 45).  Dr. Blunt stated that he believed Ontko was completely and totally disabled because he had continued left-side

9

weakness, would require repeated surgical intervention with his stents, and he could not return to the work he had previously performed. *Id.*

From September 4 to October 6, 2020, Ontko had three appointments at the stroke center. (Tr. 15-16, 27-28, 37-40). On physical examination during his first two appointments, he was noted as having decreased sensation or numbness in his left upper extremity. (Tr. 16, 28). During his last appointment, it was also noted that he had a left-hand tremor and dis-coordination. (Tr. 40).

      **C.**      **Relevant Opinion Evidence**

           **1.**      **Function Report – Sara Toris on Behalf of Steven Ontko**

On June 26, 2019, Sara Toris completed a function report on Ontko's behalf. (Tr. 316-323). As to his mobility, Ontko asserted that he was unable to use his left hand after a stroke. (Tr. 316). He described his day as undergoing physical therapy (which he had three times a week), and "general[ly] just watch[ing] t.v. after showering." (Tr. 317). He indicated that his conditions prevented him from completing work-related tasks and the pain caused disruption in his sleep. *Id.* He did not have any issues taking care of his personal needs, but he required reminders to take his medication. (Tr. 317-318). He prepared his own meals, which usually consisted of cereal or microwavable food because he was unable to use his stove. (Tr. 318). He also performed household chores, such as laundry or sweeping, which he did once a week, but it took him twice as long as normal to complete. *Id.* He did not need encouragement to perform the chores. *Id.* He did not do yard work. (Tr. 319).

Ontko explained that he went outside daily, but never alone, and could walk or ride in a car, but he did not drive because he had lost his peripheral vision. *Id.* He would go out for groceries about once a month for two hours. *Id.* Previously, he had enjoyed fishing and hunting,

10

but he was no longer able to do so because of his illness. (Tr. 320). He would spend time with others talking and he most regularly went to therapy, which he attended two to three times a week. *Id.* He asserted that the damage to his hand and the other neurological damage affected his ability to lift, reach, kneel, climb stairs, complete tasks, and use his hands. (Tr. 321).

### 2. State Agency Consultants

On July 11, 2019, Steve McKee, M.D., evaluated Ontko's physical limitations based on the medical evidence. (Tr. 121). He found that Ontko had the following exertional capacities, he could: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk 6 hours in an 8-hour workday; and was otherwise unlimited in his pushing and/or pulling. (Tr. 119). He also found that Ontko had the following postural limitations, he could: occasionally climb ramps or stairs; never climbs ladders, ropes, or scaffolds; unlimited balancing; and frequently stoop, kneel, crouch, and crawl. (Tr. 119-120). Further, he found that Ontko had the following manipulative limitations, he was: unlimited in his reaching, limited by his left hand in handling and fingering, and unlimited in his feeling. (Tr. 120). Dr. McKee specifically identified that Ontko was limited to frequent handling and fingering in his left hand due to the tremor he had. *Id.* Dr. McKee also found various environmental limitations. (Tr. 120-121). On January 3, 2020, Elizabeth Das, M.D., reconsidered the medical evidence of Ontko's physical limitations and affirmed Dr. McKee's findings. (Tr. 156-159).

### D. Relevant Testimonial Evidence

### 1. Steven Ontko

Ontko testified at the hearing. (Tr. 84-101). He explained that he was left-handed and had previously worked as a laborer for an excavation company. (Tr. 85, 87). In that role, he had to lift more than 20 pounds and sometimes more than 50 pounds. (Tr. 87-88). He had also

11

previously worked as a block layer, performing masonry work. (Tr. 88-89). Due to his stroke, the left side of his face continued to be numb, his eye was "really sore," and did not have use of his left hand. (Tr. 91). He could lift about 15 pounds with his right arm and 2 pounds with his left arm. (Tr. 93). He had trouble sleeping at night because he could not get comfortable, and his naps during the day could last up to three hours. *Id.*

Ontko described his daily activity as follows. (Tr. 94). He could shower alone and dress himself, could cook for himself, but struggled to do dishes because he dropped things with his left hand. *Id.* He would drop things at least three to four times a week and would be able to use his left hand about three times a week. (Tr. 95). He could do laundry and sweep, but he was not currently driving. *Id.* Sometimes others would drive him to the grocery store, and he could go in; at other times, others went shopping for him. (Tr. 95-96). He had been going to physical therapy since he got out of acute rehab the year prior. (Tr. 96). His girlfriend would come and help him, particularly with organizing his pills because he struggled to open the bottles. (Tr. 98-99).

### 2. Vocational Expert

The vocational expert testified that a hypothetical individual with Ontko's age, experience, and the ALJ's proposed limitations would be able to work within the national economy as a mail clerk, officer helper, or housekeeping cleaner. (Tr. 103-105). He opined that if the limitation that Ontko can "frequently reach overhead, handle, finger, and feel with the left upper extremity" was reduced to "occasionally", the individual would still be able to perform those jobs. (Tr. 105-106). However, if the individual could not use the left extremity at all then he would not be able to perform those jobs. (Tr. 106).

## III. Law & Analysis

### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"). But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

13

### B.     Step Four: Residual Functional Capacity

Ontko contends that the ALJ erred in evaluating the limitations related to his left arm and hand. ECF Doc. 15 at 13. He argues that the objective evidence shows that "critical information" as to how much and how consistently he could use his arm was omitted from the ALJ's decision. ECF Doc. 15 at 14. He asserts that although the ALJ acknowledged evidence that Ontko experienced tremors and impaired coordination more than 12 months after his stroke, the ALJ's analysis failed to consider the evidence which was supported of his testimony that he continued to be unable to use his left hand, noting two occupational therapy records indicated he still struggled. ECF Doc. 15 at 14-15. The omission of this evidence, he contends, results in meaningful review being impossible as there was no reason given for the rejection. ECF Doc. 15 at 16. Further, he argues that the ALJ erroneously appeared to rely on incidents where he painted his house and assembled a rototiller, contending that the ALJ omitted that the assembly was difficult and placed an undue emphasis on a singular event. ECF Doc. 15 at 16-18. The Commissioner disagrees. ECF Doc. 16 at 5-8.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

Although a close question, I find that the ALJ applied the proper legal standards and reached a decision supported by substantial evidence in determining Ontko's RFC with regard to his hand. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Ontko mentions the use of his left hand and harm in his challenge but focuses his arguments on the ALJ's failure to address the breaks he required when he used his left hand. *See generally* ECF Doc. 15. Accordingly, Ontko's challenge boils down to two related contentions: (1) the ALJ failed to address evidence contrary to her RFC determination, specifically evidence that Ontko required breaks when using his left hand; and (2) the failure to explain the rejection undermines the ALJ's finding that Ontko could frequently use his left hand.

Starting with the first, Ontko contends that the ALJ was required to provide reasons for why she rejected the evidence about the breaks he took. He cites *Dye v. Commission of Social Security*, No. C-1-06-05, 2008 U.S. Dist. LEXIS 86078 (S.D. Ohio Sept. 30, 2008), stating "the Sixth Circuit noted in [*Dye*], 'Failure to indicate a reason for rejection of a particular piece of evidence results in error as it can lead to a conclusion that the Secretary neglected to consider it at all.'" ECF Doc. 15 at 16. Although an accurate statement in-and-of itself, this argument contains several flaws. First – *Dye* is not a Sixth Circuit case, nor is the quote drawn from a Sixth Circuit case cited within *Dye*. Second, *Dye* does not say that.

Regardless of *Dye*, it is well-settled that an ALJ need not address every piece of evidence reviewed when writing her decision. *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004); *see also Laskowski v. Apdel*, 100 F. Supp. 2d 474, 482 (E.D. Mich. 2000) (substantial evidence "cannot be based on fragments of the record."). Moreover, the ALJ's discussion indicates that she was aware of the treatment records and considered the persistent hand limitations which trouble

15

Ontko. The ALJ recognized that Ontko testified that he could not use his left hand (Tr. 64), noted records of his left-hand tremor and dis-coordination (Tr. 66), his struggles with some therapy exercises (Tr. 66), and reduced grip strength (Tr. 66).

Thus, the issue becomes whether the evidence that Ontko needed to take breaks *as an aspect* of the physical therapy records was legally required to be addressed by the ALJ. *See Fleischer*, 774 F. Supp. 2d at 881 ("[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." (internal quotation marks omitted)). And Ontko simply has not shown that his need to take breaks was in fact contrary to the ALJ's finding.

This is best seen if we consider what it means for a movement/activity to be done "frequently." To perform an activity "frequently," under the SSA regulations requires that the individual be able to perform the activity from one-third to two-thirds of an 8-hour workday – essentially from about 2.6 hours to 5.3 hours, *cumulatively*, a day. *See Griffin v. Berryhill*, No. 3:18CV-00680, 2019 U.S. Dist. LEXIS 145062, *7 (W.D. Ky. Aug. 27, 2019). Ontko asserts in his brief that he required rest breaks every few minutes, but his therapists' records do not indicate such a frequency. (*See* Tr. 1086, 1091, 1095, 1097, 1101, 1360-1366, 1370-1373, 1375-1377). Ontko has a point that his need for breaks *may* undermine the ALJ's finding, as they may result in him being unable to meet that one-third to two-thirds benchmark. However, he has provided no evidence that *cumulatively* such a limitation should have been included in the RFC.

At best, the therapists' notes indicate that he took breaks within his sessions and that his sessions ranged in length from 24 to 62 minutes; the vast majority of sessions being about an

16

hour. *Id.* Although this could be construed as requiring breaks with more frequency than would be permitted under a "frequent" designation, it could also be construed in support of the ALJ's decision. Thus, it would be reasonable for the ALJ not to have mentioned it. Likewise, although the ALJ's reference to Ontko putting together a rototiller could have included the fact that he took many breaks in the process, we cannot infer from the existence of breaks alone that the benchmarks for "frequently" using his hands were illogical or unreasonable. And "when a record presents substantial evidence supporting two contrary conclusions, a reviewing court must affirm the findings of the Commissioner." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 960 (N.D. Ohio Jun. 24, 2003) (citing *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)).

Moreover, substantial evidence supported the ALJ's determination that Ontko could frequently use his left hand. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Such evidence includes: (1) treatment notes indicating his left-hand strength was improving (Tr. 1076-1077, 1086, 1100, 1104-1105, 1140, 1335); and (2) Ontko's own statements that he could perform daily activities and do such things as putting together a rototiller and painting (Tr. 94, 317-318, 1085-1097). *See Biestek*, 139 S. Ct. at 1154.

Even if the ALJ should have found Ontko to be more limited in his handling abilities, however, the VE testified that the same jobs could have been performed by someone who was limited to occasional – as opposed to frequent – fingering and handling. Thus, even if the ALJ did err in including a frequent handling limitation in the RFC (and it does not appear that she did) the error would have been harmless. Ontko has not shown that he was unable to use his left hand to engage in work activities occasionally.

Accordingly, I find that the ALJ did not err in determining that Ontko could "frequently" use his hand and, thus, the decision must be affirmed. Even if it were concluded that frequent

17

handling was beyond Ontko's capabilities, the error would have been harmless on the record before us.

### IV. Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Ontko's applications for DIB and SSI is affirmed.

**IT IS SO ORDERED.**

Dated: June 13, 2022

Thomas M. Parker
United States Magistrate Judge